## Martha W. Millard, Administratrix, v. Oscar F. Millard, et al.

### Gen. No. 11,951.

1. BILL FOR DISCOVERY—*when may waive answer under oath.* A bill which seeks other relief in addition to a discovery may properly waive answer under oath.

2. BILL FOR DISCOVERY—*when equity has jurisdiction to entertain.* Equity has jurisdiction to entertain a bill for a discovery and for an accounting notwithstanding the complainant might have sued at law to recover the value of the property involved, admitted by the defendant to have been in his possession and disposed of by him, where by virtue of such proceeding other property than that so admitted to have been disposed of might be discovered; and the jurisdiction is not lost where no such additional property is discovered.

3. ANSWER—*defendant not permitted to deny averment of.* It is not competent for a defendant to deny facts admitted by his answer.

4. ADMISSIONS—*what competent in explanation of.* It is competent in order to explain an admission proven to show the entire conversation in which such alleged admission took place.

Millard v. Millard.

5.  GIFTS *inter vivos—what essential to establish.*  In order to establish a gift of personal property *inter vivos* the delivery must appear to have been absolute, that is to say, the donor must appear not only to have parted with the possession of the property, but he must likewise appear to have relinquished to the donee all dominion and control over it.

BAKER, J., dissenting.

Bill for discovery and accounting.  Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding.  Heard in the Branch Appellate Court at the October term, 1904.  Reversed and remanded.  Opinion filed October 27, 1905.

Statement by the Court.  This is an appeal from a decree of the Circuit Court of Cook County dismissing for want of equity a bill filed by appellant, who is administratrix with the will annexed of the estate of her husband, Winfield Scott Millard.  The latter died in Chicago on the 27th of July, 1896, leaving appellant, his widow, and a son Joseph B. Millard, then about eleven years of age.  He left a will dated March 25, 1891, in which he gave to his wife absolutely in fee such portions of his real estate as she would by law be entitled to if he had died intestate, and all the personal property to which she would under the same circumstances be entitled under the laws of Michigan, in other words one-third of his real estate and one-half of his personal estate; and to his son Joseph B. Millard all the rest, residue and remainder of his estate, both real and personal, with the provision that should the son die before attaining the age of twenty-one years without issue, such residue should go to the brothers and sister of the testator and their surviving children.  No executor having been named in the will, the widow was appointed and duly qualified as administratrix with the will annexed.  The deceased had acquired considerable property.  There is evidence tending to show that his estate exceeded in value $100,000, that his personal estate exceeded $75,000, a part of which was kept in a box at the National Safe Deposit Company's vaults at Chicago; that a little over a year before his death he had in said safe deposit vault three packages of gold certificates, one of which alone contained more than $15,000,

some currency, a diamond stud and ring, some U. S. Government bonds and West Chicago Street Railway bonds, the latter of which were registered in his name.

After testator's death and complainant's appointment as administratrix she went to the vault referred to, to examine and make an inventory of the property there deposited. All that she found there was $29,000 in U. S. Government bonds, some West Chicago Street Railway bonds amounting to about $6,000, and a certificate of deposit for $1,000 on the Three Rivers National Bank of Michigan, all of which were registered in the name of the deceased. There were no diamonds and no gold certificates and certain Kentucky railroad bonds which were known to have been there were missing. Everything not registered in the name of the deceased had been taken away. Upon inquiry of the company's officers appellant discovered what appears to have been before unknown to her, that the mother of the deceased, then an aged woman, said to be about eighty years of age, had a key to the box and that she, in company with a son and daughter, defendants herein, had recently visited it. Acting upon this information appellant cited these parties into the Probate Court, where testimony was taken, and by their admissions it was disclosed that on the 22nd of April, 1896, three months before the death of the testator, who was then ill, confined to his house and much of the time to his bed, the mother of the deceased, Jane H. Millard, together with his brother, Oscar Millard, and his sister, Mrs. Lucy Simpson, went to the National Safe Deposit vault and there, according to their testimony, removed five Kentucky railroad bonds with the January and July coupons still attached, gold certificates amounting to $12,070, a $50 greenback and a $10 gold piece. These they retained until after the death of testator when Oscar Millard, with his sister's co-operation, took them over to Michigan and there they collected the coupons upon the Kentucky railroad bonds, sold the bonds and retained the proceeds. It further appeared that on the day of the testator's death Jane H. Millard, the mother, and Oscar Millard, his brother, know-

Millard v. Millard.

ing that the testator was then dying, went again to the vault of the National Safe Deposit Company and opened the testator's box for the purpose, as they state, of making an inventory of what remained therein.   It further appeared that the mother, Jane H. Millard, claimed to be entitled to the property taken, as above stated, from the box in the safe deposit vault by virtue of a gift from the deceased which she claimed had been made by·him in June, 1893, more than three years prior to his death.

Thereupon appellant as administratrix with the will annexed of her husband's estate filed her bill of complaint, setting up *inter alia* the following facts: that a large quantity of money and money securities, value unknown, amounting to several thousand dollars, were kept by the testator in his private lock box in the vaults of the National Safe Deposit Company and that Jane H. Millard, the mother, and the testator alone during the testator's lifetime had access to said box and the contents thereof; that for eight months prior to his decease, testator was constantly confined to his house by illness and that at a time immediately after or shortly before his death Jane H. Millard, with the co·defendants Oscar Millard and his sister Lucy M. Simpson, wrongfully removed from said box and took into their own possession said gold certificates, railroad bonds and a large amount of other bonds, moneys, bills and money securities which without the knowledge of the complainant they secretly and wrongfully removed out of the State of Illinois to Michigan, and wrongfully and fraudulently converted to their own use.   It is alleged that all of the property so taken by defendants was the property of deceased at the time of his death and upon his decease became, was and is the property of his estate and belonged of right to the complainant as administratrix.   It is further shown that the defendants wrongfully claimed and pretended that the testator during his lifetime made a gift of said property to Jane H. Millard and that she became therefore and was the owner thereof, which claim the complainant insists is false.   The bill states that the complainant has no specific

knowledge or information as to the particular description
of the property so taken by the defendants or as to its kind
or value, except such information as has been derived from
statements made by the defendants themselves in claiming
that said property is a gift from the testator to said Jane
H. Millard.

Complainant prays for an answer without oath and for a
complete discovery with reference to any and all property
of the deceased which came to the possession of the defend-
ants or any of them before or since his decease, how they
obtained possession of it, that if they or any of them claim
the ownership of such property or any of it by gift from
the deceased, they set out fully and particularly all facts
relating thereto and show what, if any, disposition they
have made of the property, and that they may be decreed
to account for, pay over and surrender all such property or
the proceeds of any of it which they may have sold, with
all increase, interest and profit thereon, to the administra-
trix. There is a prayer for general relief.

To this bill the defendants demurred, and the demurrers
having been overruled separate answers were filed by each
of the defendants. Exceptions were taken to the several
answers, some of which were sustained and further or
amended answers were filed. Subsequently complainant
filed additional interrogatories and obtained a rule on the de-
fendants to answer. From the various answers and further
answers filed it appears that each and all of the defendants
deny that they or any of them ever visited the said deposit
vaults, and that they have any information, knowledge or
belief that the deceased ever rented such a box or kept
any property therein, and that they ever wrongfully took
any property therefrom. They set up in the answers the
proceedings in the Probate Court, for the purpose, it is
said by their counsel, of showing that the matter was *res
adjudicata*, that complainant was in possession of all the
facts and that a bill of discovery was unnecessary. In this
connection defendants' counsel call attention to the dis-
tinction which it is claimed is made in the answers between

the two compartments of the box in the Safety Deposit Vaults, one of which Jane H. Millard claims was assigned by the deceased to her "so that each compartment was practically a distinct and individual box."

The issues having been made up, there was a reference to the master April 20, 1901, to take the proofs and report the same with his conclusions. In the meantime the mother, Jane H. Millard, then about eighty-five years of age, died and her death was suggested on the record June 3, 1901. Her answer to complainant's interrogatories was filed April 17, shortly before her death.

Upon the hearing before the master the complainant read under a stipulation portions of the defendants' testimony given before the Probate Court under the citation before referred to. Over the complainant's objection the master permitted the defendants to read other portions of the testimony given by the defendants during the proceedings before the Probate Court, in which the witnesses testified to circumstances attending the alleged gift of the property in question by the deceased to Jane Millard.

The master reported, recommending that the bill be dismissed for want of equity. Objections to this report were filed by both sides and were overruled, defendants' objection being that the court had no jurisdiction of the subject-matter involved in the pleadings. Exceptions were taken by the complainant. The chancellor confirmed the master's report and entered a final decree dismissing complainant's bill for want of equity. From such decree appellant prosecutes this appeal.

CHURCH, McMURDY & SHERMAN, for appellant.

W. H. RICHARDSON, for appellees.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is claimed on behalf of appellees that the Circuit Court had no equitable jurisdiction of the subject-matter, that complainant had an adequate remedy at law, and that while the object of the bill was ostensibly to compel a discovery,

yet since the oaths of the defendants to the answers were
waived complainant thereby disclaimed the right to dis-
covery from the defendants. The bill, however, is not a
bill for discovery alone. It seeks both discovery and relief.
The statute provides (R. S. Chap. 22, Sec. 20,) that when a
bill "other than for discovery only" shall be filed in a court
of chancery the complainant may waive the necessity of
the answer being made on the oath of the defendant, and
in such cases the answer without oath shall have no other
or greater force as evidence than the bill. In the present
case the complainant avers in her bill that she has reason
to believe and does believe that the defendants are in pos-
session of other property than that which by their testi-
mony in the Probate Court they admitted they had secretly
taken from the vault of the testator and retained in their
possession, and prays for relief as to all property in the de-
fendants' hands. "Where a bill for discovery and other
relief is filed a court of equity does not lose jurisdiction by
reason of the waiver of the oath to the bill," (Hair Co. v.
Daily, 161 Ill. 379–384,) and (p. 385) "An oath may be
waived in a bill for discovery where other relief is asked."
There is evidence which tends to show that the complain-
ant had reason when appointed administratrix of her hus-
band's estate to expect to find a large quantity of securities
in his box in the safe deposit vault which were not there
after his decease; and that instead of finding gold certifi-
cates and other assets which not many months before were
there on deposit she discovered that nothing remained ex-
cept what was registered in the name of the deceased and
could not therefore be disposed of by any person improp-
erly obtaining possession thereof without serious risk of
detection. It is hardly correct to say that the claim for a
discovery was "used as a mere pretext to give jurisdiction
and was a miserable failure." While the evidence was not
sufficient perhaps to warrant a finding that specific prop-
erty of the deceased, other than that which the defendants
admitted having taken, had come into their possession,
there was at least some evidence tending so to show. It is

true that taking advantage of appellees' admission made in the Probate Court complainant might have brought an action at law to recover the value of the property conceded to be in defendants' possession, but she was still entitled to require them to disclose, if she could, whether or not they had other property of the testator, the possession of which had not been admitted, and to account for what they had. It is charged in the bill that in addition to having possessed themselves of certain Kentucky railroad bonds defendants secretly and wrongfully removed them from Illinois to Michigan and converted the bonds and coupons into money. It is one of the usual grounds of equity jurisdiction to discover property wrongfully concealed, converted and with-. held from the real owner and to compel the wrongdoer to an accounting. Russell v. Madden, 95 Ill. 485–493. The defendants are the only parties having actual knowledge of the contents of the testator's strong box when they first visited it. Having admittedly taken certain property from it in a surreptitious manner without the testator's knowledge and when he was incapable of protecting his own and without the knowledge of his heirs and legatees, and having at least tampered with other property which they do not even pretend to claim an interest in, complainant was amply justified in bringing them into equity to account for their conduct, and was not bound to accept their own statements as to what they took as conclusive, nor the sufficiency of their alleged reasons for what they did. The defendant Jane Millard claimed the property admitted to have been taken as a gift. She was the only person entrusted by the testator with access to his box in the safety deposit vault and so held a relation of trust and confidence to the deceased, which she is charged with having fraudulently violated. There is, we think, no question that equity has jurisdiction to entertain this bill, even though the proof disclosed no new facts not before known. Russell v. Madden, 95 Ill. 485, *supra*; Barnum v. Reed, 136 Ill. 388–398; Chambers v. McCreery, 106 Fed. Rep. 364; Perry on Trusts, Vol. 1, Sec. 166; Scoville, Public Administrator, v. Post,

3rd Edwards Chan. 216; Newton v. Porter, 5 Lansing, (N. Y.) 416–424.

It is claimed in behalf of complainant that there is a fatal variance between the findings and decree and the issues raised by the pleadings. It is true that the answers appear to deny explicitly material facts which were admitted in the testimony of the defendants read in evidence. It is diffi- cult to see upon what ground they were entitled to intro- duce evidence to contradict material averments of their answers, or how a decree based upon such pleadings can be sustained. Parties are held bound by their pleadings, and should not be permitted to avail themselves of facts estab- lished by the proofs which have been expressly denied in the answers. Kellogg v. Moore, 97 Ill. 282, 287; Dor- man v. Dorman, 187 Ill. 154–161; Kehm v. Mott, 187 Ill. 519, 522. It is true that an answer not under oath is not evidence in the case, and performs merely the office of a pleading, but it is a well known rule in chancery practice "that a defendant must set up his defense by plea or answer, and cannot avail himself of any defense not so set up, even if proven by the evidence." Kehm v. Mott, *supra.*

Appellant urges that the evidence relied upon to establish the alleged gift is incompetent for that purpose. That evidence consisted of extracts from the testimony of the alleged donee and of the defendants taken before the Pro- bate Court under citation, and that of two other witnesses also taken in that proceeding. Where evidence of an ad- mission by a defendant is introduced the other party is en- titled to the whole conversation or statement, so far as it is relevant. In this case complainant, having proved cer- tain admissions by the defendants, the latter were entitled to introduce the explanation made at the same time. Mc- Intyre v. Thompson, 14 Ill. App. 554, 556; Augler v. Smith, 34 Ill. 534; Merritt v. Campbell, 79 N. Y. 625; Platner v. Platner, 78 N. Y. 90, 103; Wharton on Evidence, Vol. 2, Sec. 1109. Some of the testimony so read in evidence by defendants' counsel was not, we think, competent or rele-

vant, but as the case is one which should be considered on the merits, we deem it unnecessary to particularize.

The claim of the defendants is that the securities and money taken by them from the testator's box in the safety deposit vault became the property of his mother, Jane H. Millard, by virtue of a gift alleged to have been made to her by the testator in June, 1893, three years before his death, which occurred July 27, 1896. She was almost eighty-one years of age, as she stated when she gave her testimony. Her statement is that in 1893 she was living in Kalamazoo, Michigan, when she received a telegram from the deceased asking her to meet him in Chicago, which she did; that while here she went with him to the National Safe Deposit Company's vaults, where he had taken a box. He introduced her to the manager, saying, "She is going to take the box with me." The manager testifies that he said he "wanted his mother to have a right to go to the box," and further that "Jane Millard was the only one whom Scott Millard instructed us to allow access to that box. No one else was allowed to go. He said she should have the right to go and that was all. I think I said, 'that is the only person I should let go to that box.'" The mother testifies that the deceased got out the box, that they went into the sitting room, that her son counted over what he had in it and took $12,000 and upward of gold certificates and some bonds which he put into one end of the box, which had two compartments, saying, "Now, there, mother, that is yours. There is no need of your getting another box;" that he then put his papers into the other end of the box and closed it, gave her the key and pass word, and they left the place. She did not go to the vault again until January, 1896, when she states that she looked at the "package" in controversy, but did not open it. She did not go there again until April 22, 1896, when, in company with her son, Oscar Millard, and her daughter, Lucy M. Simpson, they took away the so-called "package," which they stated contained $12,070 of gold certificates, a $50 greenback, a $10 gold piece and bonds of the Louisville

& Frankfort Railroad Company, amounting to $5,000 with coupons representing a year's interest, being $350. No one else was with them at this time, and neither the testator nor his family were aware of what they did. The mother herself says the deceased was not then able to be out of his house, and that he had not been out since the previous November. He never afterward went out until his death. The mother gave the "package" to her son Oscar, who sold the railroad bonds in Michigan for $5,350 at his own instance with the consent and connivance of Mrs. Simpson, without whom he could not have gotten them, and without his mother's knowledge. They did not deem it necessary to even consult her. He deposited the proceeds, together with the gold certificates, in his own name in a place of safety deposit. Upon the day of the testator's death, when advised that he could not live, the defendants, Oscar Millard and Mrs. Simpson, with the mother, again visited the safety deposit vault of the deceased and examined and inventoried the property of the testator remaining in the box. Nothing was left there which did not stand in the name of the deceased.

In addition to the testimony of Jane H. Millard, the mother of the testator, who died pending the litigation, there was read in behalf of the defense testimony given by the two defendants Oscar Millard, his sister Mrs. Simpson and his sister-in-law, a Mrs. Hewitt. The former states that about the 10th or 11th of April preceding the testator's death, he had a conversation with the latter, at which Mrs. Simpson was present, in which he states the deceased said: "Oscar, mother and I have a box together under the First National Bank, and I think it is time she took it away—her package that is in that box—and I wish you would go with her and get it and tell her to put it in some other place;" and that he mentioned the amount in the "package." The sister, Mrs. Simpson, testifies that the deceased told her he had provided for his mother "with some gold certificates and bonds which are in the package in the vault to which she has the key and pass word. Lou, I

want you to see that mother gets them." She states also
that he told her in reply to a question whether his mother
had ever tried to get any property from him, "Never, Lou,
never. What I have given to her I had a right to give
to my own mother." Mrs. Hewitt's testimony is that
a few days before his death he said to her, "Mother and I
have a box together in the bank and she has a package
there, and I wish to know whether she has taken it out or
not, and if not I wish to have her take it out as I will not
last very long, I would like to have her go this afternoon
and get it. You know tomorrow is Saturday and the
banks close at one o'clock. I want her to have this pack-
age before I die." In reply to this testimony the physi-
cians who examined the sick man at about that time testify
that in their opinion the deceased at that time had not suf-
ficient intelligence to comprehend his business affairs or to
carry on an intelligent conversation; and other witnesses
testify that no such conversation occurred at the time
stated.

The only witness who testifies to the actual gift is the
mother and alleged donee, Jane H. Millard. According to
her testimony the deceased put the securities in controversy
into a separate compartment of his safety deposit box, told
her that the property was hers and gave her a key and the
means of having access to the box, telling her it was un-
necessary for her to get a separate box of her own. It is
clear, however, that he did not surrender dominion over
the box or the securities. He regularly thereafter removed
the coupons from the bonds constituting a part of the al-
leged gift as they became due, collected them and retained
the proceeds. The mother herself meanwhile did not ex-
ercise or attempt to exercise any act of ownership over the
alleged gift. She did not even visit the box for nearly three
years and until her son's condition was such that it was im-
possible for him to leave his home, or to learn of, much less
prevent, the removal of the alleged gift from his box. Mean-
while, when unable to go himself, his wife had gone Febru-
ary 28, 1896, with an order from him to the National Safety

Deposit Company to allow her access to the box that she might cut the coupons off the Kentucky railroad bonds. She was, however, refused admission to the vault by the officers of the company under their rules.

As we have said, the mother and alleged donee was the only one present with the deceased at the time when he gave her a key and access to the vault. All that then occurred, unless it be the alleged words of gift, is consistent with an intention on his part to allow her to use the box for such securities of her own—some of which, it appears, she had—as she might wish to keep in such a place of safety. The alleged gift did not pass into the mother's physical possession and was not then placed under her exclusive control. Whatever intention of making the alleged gift may have been expressed or implied in the words she states the testator used, was never carried out by him. Indeed, the words attributed to him "that is yours.. There is no need of your getting another box," do not expressly refer to the alleged gift and are consistent with an intention to give her merely the use of the box. They are not explicit enough unmistakably to define the alleged gift. That he intended to make such a gift is contradicted by the testator's subsequent conduct, and that the alleged donee herself then so understood is scarcely consistent with her own subsequent conduct. A little more than three months before his death, when unable to leave the house, he sent a note to his mother in Chicago as follows: "Dear Mother: Please send the promised package by Joseph. Affectionately, Scott. April 7th, 1896." To this, the mother, knowing that he could not leave the house, replied: " Mr. Scott Millard; Dear Son: I will meet you at the bank any time you say, but I can not send it to you, but I will meet you as I dare not send it. I know we cannot come down to see you, but can not you come up? Affectionately your —Jane H. Millard—mother." To this the deceased replied: "April 7. Dear Mother: Send the package by bearer. Affectionately, W. S. Millard." The young son of the deceased, Joseph, testified that he carried the first note at

his father's request, accompanied by a man employed to take care of his father, and that upon receipt of the note his grandmother angrily abused the boy's mother,—complainant herein—and said she would see about it, and that when he reported to his father, the latter "didn't like it very well." A servant testified that she carried the second note from the deceased to Jane H. Millard, who said she had sent the message by the boy; and that when the messenger returned without the parcel the deceased was very angry. This was about two weeks before the mother, with the aid of the defendants, took the alleged gift from the testator's safety deposit box. The mother, when called on to explain this correspondence, states that it referred to a "package that I was to send down to him;" and upon being pressed further, says it was the key of the safety deposit box which she had promised to send to him. In other words, by her statement while the alleged gift was still in the testator's box he sought to recover possession of the key which his mother had, giving her access thereto, and by her own confession she promised to send it to him. This correspondence is consistent with the explanation that, being unable to go to the vault himself and his wife having failed to secure admission on his order, he had requested his mother, the only other person having access to the vault, to go there and get for him the "package" of his securities in controversy, and that she had promised to do so. It is significant that very soon after this incident the property now claimed as a gift was taken by the defendants. But no matter how we look at it, if we believe her testimony, it is apparent that for some reason the testator then desired to prevent his mother from having further access to the contents of the box containing the alleged gift, and to resume the sole control over it himself; and that she apparently conceded his right to do so, and promised to return him the key. Documentary evidence and admissions of this kind fairly outweigh the testimony of interested parties as to alleged statements of the deceased that he had given his mother the property in controversy and wanted her to have it.

The principles which control the question of gifts *inter vivos* are well settled. In Am. & Eng. Ency. of Law, Vol. 14, page 1019 *et seq.*, (2nd Ed.) cited by appellees' counsel, it is said " the delivery must be absolute; that is, the donor must not only part with the possession of the property, but he must relinquish to the donee all dominion and control over it." Here the donor retained and exercised control over the property in question after the alleged gift, appropriating to his own use the coupons and interest as before. It has been said that a delivery necessary to transfer ownership by gift may be made by delivering to the donee the means of obtaining possession of the property whereby he is put into constructive possession of it, as when the key affording access to the property is delivered " with the intention of placing him in possession." *Idem.* In the case at bar the only evidence of such intention at the time is the unsupported statement of the donee; and this is contradicted by the subsequent conduct of the alleged donor and by the admission of the alleged donee herself that she promised to return him the key when the alleged gift was still in the testator's box with other property in which the donee never pretended to have any interest. The law requires not only that the donor shall relinquish all control and power of exercising dominion over the alleged gift, but the donee must obtain exclusive power of taking physical possession of it, so that it is in fact placed under his or her sole dominion. Pomeroy's Eq. Jur., Sec. 1149; Chambers v. McCreery, 106 Fed. Rep. 364–368; Young v. Young, 80 N. Y. 422–431, where it is said that " if the donor retains the instrument under his own control, though he do so merely for the purpose of collecting the interest, there is an absence of the complete delivery which is absolutely essential to the validity of the gift." In Barnum v. Reed, 136 Ill. 388–398, it is said that " to constitute a valid gift *inter vivos*, possession and title must pass to and vest in the donee irrevocably;" that " the donor must part with all control of the property in order to make a valid gift. If he reserves any right or title the gift will be incomplete."

Millard v. Millard.

Appellees seem to rely on Martin v. Martin, 170 Ill. 19. In that case, however, the donee had the key and the only key from the time the box was first rented "with absolute control over the box and its contents" (p. 32) and (p. 33) "the box was hers (the donee's) and she had the keys and if a coupon or paper was ever given him (the donor) for any purpose she got it for him. He could not get one of them except by her giving it to him." No such conditions existed in the case at bar. Many cases might be cited, which sustain the views we have expressed, but we deem it unnecessary to prolong the discussion.

The conduct of appellees does not strengthen confidence in their testimony intended to show that the testator stated to them that he had given the property in controversy to his mother. They went to the vault in company with their aged mother secretly, with no disinterested party as a witness. They not only took the alleged gift from the testator's box, but they overhauled the other securities and valuables there deposited. They left nothing behind except what was registered in the testator's name. There is evidence tending to show that the testator had considerable additional property on deposit there shortly before he ceased his own visits to the vault because of his physical condition. As said in Chambers v. McCreery, *supra*, (p. 369) the law is that an interested party who claims a gift from another "shall be required to show by evidence free from personal interest and not equivocal in character, that the property claimed was delivered to the donee during the donor's lifetime and controlled by the former while the latter lived." It is true that the mother with the aid of the surviving defendants obtained possession of the property before the actual death of the testator, but at a time and under circumstances when he was powerless to object and ignorant of what had occurred. The alleged gift receives no support from such taking possession any more than if an actual larceny had been committed.

The surviving defendants were even more interested apparently in the alleged gift than the alleged donee now

deceased. It appears that after getting the property in their possession they entirely ignored the mother and without consulting her disposed of it as they saw fit, and still retain its proceeds. It is proper, therefore, to require them to account for and pay over to the administratrix the property in controversy or its equivalent.

The decree of the Circuit Court will be reversed and the cause remanded to that court for further proceedings not inconsistent with the views above expressed.

<em>Reversed and remanded.</em>

Mr. Justice BAKER, dissenting.